IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

UNITED STATES OF AMERICA      : CRIMINAL NO. 91-570-20
                                                 :
                                                 :
                                                 :
                                                 :
               v                                 :
                                                 :
                                                 :
                                                 :
                                                 :
DERRICK WILLIAMS                    :
also known as                            :
LITTLE DERRICK,                       : Philadelphia, Pennsylvania
                                                 : April 7, 2010
               Defendant    : 10:10 a.m.

- - -

TRANSCRIPT OF VIOLATION OF SUPERVISED RELEASE HEARING
BEFORE THE HONORABLE EDUARDO C. ROBRENO
UNITED STATES DISTRICT JUDGE

- - -

APPEARANCES:

For the Plaintiff:        ARLENE D. FISK, ESQUIRE
                                   Assistant United States Attorney
                                   United States Attorney's Office
                                   615 Chestnut Street
                                   Suite 1250
                                   Philadelphia, PA   19106


For the Defendants:     PAUL J. HETZNECKER, ESQUIRE
                                    1420 Walnut Street
                                    Suite 911
                                    Philadelphia, PA    19106


Probation Officer:        KENNETH BERGMANN
                                   United States Probation Office
                                   Suite 2400
                                   600 Arch Street
                                   Philadelphia, PA   19106


*Transcribers Limited*

*17 Rickland Drive*
*Sewell, NJ 08080*
*856-589-6100 • 856-589-9005*

2

1    Audio Operator:        Joseph Matkowski

2    Transcribed By:        Jeff Nathanson

3                              -  -  -

4              Proceedings recorded by electronic sound
     recording, transcript produced by computer-aided
5    transcription service.

6                              -  -  -

3

```
 1              (The following was heard in open court at
 2   10:10 a.m.)
 3              THE COURT:  Good morning.  Please be seated.
 4              MS. FISK:  Good morning, Your Honor.
 5              MR. HETZNECKER:  Good morning, Your Honor.
 6              THE COURT:  So, we are here today on a
 7   violation of supervised release.  So, Ms. Fisk, what is
 8   the status of the matter?
 9              MS. FISK:  Your Honor, the government is
10   ready to proceed.  With permission of the Court,
11   defense counsel has agreed to an initial proffer of the
12   evidence made by the government, and I have Mr.
13   Bergmann available for cross-examination by defense
14   counsel to clarify any issues that the defense has.
15              THE COURT:  What is the defendant's position
16   as to the violations?
17              MR. HETZNECKER:  Your Honor, some of these
18   violations were are conceding, and we will concede
19   them.
20              THE COURT:  Okay.
21              MR. HETZNECKER:  Others I challenge, and I
22   would like to cross-examine, based on the government's
23   proffer.
24              THE COURT:  Which ones are you conceding?
25              MR. HETZNECKER:  Well, I' conceding number
```

4

1    one, condition number one.

2         THE COURT:  Okay.  Let's see.

3         MS. FISK:  Your Honor, there is some just

4    additional information that I would like the Court to

5    have with regard to condition number one, and the

6    manner in which that evidence was obtained.

7         THE COURT:  Well, he's conceding it.

8         MS. FISK:  I understand that, but in terms of

9    the defendant's adjustment to supervised release --

10        THE COURT:  Okay.  Well, you can argue that

11   later.

12        MS. FISK:  It's in the way of evidence, Your

13   Honor, as opposed to argument.

14        THE COURT:  It's conceded.

15        MS. FISK:  Very well, Judge.

16        THE COURT:  Okay.  Now, number two?

17        MR. HETZNECKER:  Number two, where it says

18   "Standard condition number three," that's what I have

19   on my notice sheet, Your Honor.

20        THE COURT:  Well, the second one is "He shall

21   answer truthfully all inquiries by the probation

22   office", and on February 23rd a scheduled visit, he had

23   a BMW car key, et cetera.

24        MR. HETZNECKER:  Right.

25        THE COURT:  What's your position on that?

1    MR. HETZNECKER:  We have information about
2  the BMW.  With respect to whether or not my client
3  provided truthful information at the time, obviously I
4  was not present, so I can't really contest that part
5  of it, but I do have information about the vehicle
6  today.
7         So, to the extent that we have the
8  information today, whether he was in compliance then or
9  not, you know, obviously, if the probation officer
10  says that he said certain things, I certainly can
11  cross-examine him about that, but I think what's more
12  important at issue is whether or not he has the
13  information regarding the car today, and he does.
14         THE COURT:  He had what?
15         MR. HETZNECKER:  Whether he has the
16  information regarding the vehicle, and he has that
17  information today.
18         THE COURT:  Okay.  How about number three?
19         MR. HETZNECKER:  Number three, which is --
20         THE COURT:  Eleven recorded conversation with
21  Aaron Jones.
22         MR. HETZNECKER:  Yes, Your Honor.  We're
23  conceding that.  However, I would point out, and I
24  think this is important to look at the sequence of
25  events, the probation officer obtains the records of

6

1   the recorded conversations in July.  There then is a

2   conversation in August between him and my client

3   regarding conversations with Aaron Jones.

4          I think the government will concede there

5   were no conversations with Aaron Jones following May of

6   2009.  So, to the extent that Mr. Bergmann obtained the

7   recorded conversations in July, and then had that

8   subsequent conversation with my client on August 26th,

9   yes, we concede that prior to that there were recorded

10  conversations with Aaron Jones.

11         THE COURT:  But, the point is was he

12  associating with persons who have been convicted of

13  felonies without permission of the probation officer?

14  I mean, is there any question possibly about it?   He

15  had eleven conversations with a convicted felon.

16         MR. HETZNECKER:  Correct, and we're not

17  disputing that.  May I have one moment with my client,

18  Your Honor?

19         THE COURT:  Yes.

20         MS. FISK:  Your Honor, there were an

21  additional twenty-six phone calls, as noted in the

22  final paragraph of that violation, with additional

23  felons, between the period of July 15th, 2009, up and

24  through January 17th of 2010, twenty-six phone calls to

25  additional state inmates.  Those records have also been

7

1  obtained, and the defendant's having conversations with

2  those individuals, as well.

3       THE COURT:  Okay.  So, that's really it,

4  that's admitted.  Now, how about --

5       MR. HETZNECKER:  But, Your Honor --

6       THE COURT:  Yes?

7       MR. HETZNECKER:  I would like to

8  cross-examine Mr. Bergmann regarding those

9  conversations and the sequence of events, because I

10 think it's significant for this Court to know what, in

11 fact, was known prior to that date, and following the

12 conversations with Mr. Bergmann, what happened with

13 respect to those conversations.  I think it's important

14 for the Court to know that.

15      THE COURT:  Okay.

16      MR. HETZNECKER:  The probation office was

17 aware of this, they had been aware of this.

18      THE COURT:  Right, so what?

19      MR. HETZNECKER:  Well, I think it's important

20 for the Court to know, that's all.

21      THE COURT:  Okay.  I'll accept that.  They

22 were aware of it, so what?

23      MR. HETZNECKER:  I guess that's my point, so

24 what?

25      THE COURT:  Okay, so what's the point?

8

1    MR. HETZNECKER:  My point is that I think he

2  didn't violate them then, he didn't violate them on

3  August 26th, when he was aware of it.  There was no

4  violation filed at that point.  He's been on supervised

5  release for five years.  So, at that point, Mr.

6  Bergmann did not violate him.

7    THE COURT:  Because the probation officer was

8  aware of it?

9    MR. HETZNECKER:  For whatever reason, he

10  exercised his discretion not to violate him at that

11  time.  My client admitted those conversations, from

12  what I understand.

13    THE COURT:  Right.  So, you mean if he waived

14  the right to violate him, is that it?

15    MR. HETZNECKER:  No, no, in terms of

16  mitigation, I'm not contesting that there was a

17  violation.

18    THE COURT:  Okay.

19    MR. HETZNECKER:  But, in terms of

20  mitigation --

21    THE COURT:  Okay.  Well, we'll get to

22  mitigation.

23    MR. HETZNECKER:  All right.  That's fine.

24  That's fine.

25    THE COURT:  We'll get to mitigation.  Now,

9

1   let's see.  If we go by in the order, let's just be

2   sure that we do it and we go in the order in which we

3   have here.  That was A, then we did B, then we did C,

4   that's association with criminal activity, we've done

5   that, then, we'll do D.

6           MR. HETZNECKER:  Not criminal activity, Your

7   Honor, association with known felons.

8           THE COURT:  With any person convicted of a

9   felony.

10          MR. HETZNECKER:  Right.

11          THE COURT:  Yes, okay.

12          MR. HETZNECKER:  There's no allegation of

13  criminal activity.

14          THE COURT:  Right, exactly.  D, "The

15  defendant shall not associate with any person engaged

16  in criminal activity."  Now, that's something different

17  than C.  C is --

18          MR. HETZNECKER:  We're contesting that.

19          THE COURT:  -- a convicted felon, D is a

20  person engaged in criminal activity.

21          MR. HETZNECKER:  No, we are contesting that.

22          THE COURT:  Okay.  So, we will put that

23  aside.  Now, E, "The defendant shall notify the

24  probation officer within seventy-two hours from being

25  arrested."

10

1    MR. HETZNECKER:  Your Honor, he wasn't

2  arrested.

3    MS. FISK:  Or questioned.

4    MR. HETZNECKER:  It was a questioning.

5    THE COURT:  Questioned by a law enforcement

6  officer.  Now, I thought there was some decision by the

7  Third Circuit on that, on the issue of questioning,

8  whether that was too broad.  Anybody familiar with that

9  decision by the Third Circuit?

10    MS. FISK:  I am not, Your Honor.

11    MR. HETZNECKER:  I am not, Your Honor.

12    THE COURT:  Okay.  Would you check that out?

13  I think that Judge Sloviter said that that condition in

14  our standard conditions was too broad to be enforced.

15  So, I think if we check that out, maybe we have to toss

16  this out.

17    MS. FISK:  Okay.

18    MR. HETZNECKER:  I appreciate that, Your

19  Honor.

20    THE COURT:  Yes.  Okay.  Yes, sir.

21    MR. BERGMANN:  Your Honor, if I may?  It's my

22  understanding that what Your Honor is speaking to is

23  questioned about criminal activity.

24    THE COURT:  Right.

25    MR. BERGMANN:  Mr. Williams was questioned

1   about a stabbing that had taken place at this party.

2           THE COURT:  Okay.  Why don't we look at the

3   opinion?

4           MR. BERGMANN:  As a witness, Your Honor, as a

5   witness.

6           THE COURT:  Let's look at the opinion and

7   make sure that we are within the parameters of what it

8   said.  I think it was Judge Sloviter who wrote the

9   opinion, so we'll check that out in a minute.

10          Okay.  So, let's see what we have here.  We

11  have then standard condition number one.  I think that

12  was admitted.

13          (Pause in proceedings.)

14          THE COURT:  Okay.  Let's go by the letters, I

15  guess.  A was admitted.  Now, B, that was not admitted.

16  Okay.  C, that was admitted.  Okay.  D, not admitted,

17  and E is in question.  So, we have two of them that

18  have been admitted.  Is that right, Mr. Hetznecker?

19          MR. HETZNECKER:  Yes, Your Honor, that is

20  correct, we admit those two.

21          THE COURT:  Okay.  Fine.

22          MR. HETZNECKER:  With respect to B, again, I

23  would just like an opportunity just to question the

24  probation officer --

25          THE COURT:  Okay.

12

1      MR. HETZNECKER:  -- because we're not -- I'm
2  not necessarily --
3      THE COURT:  You are not conceding it, you are
4  contesting it, yes, I understand that.
5      MR. HETZNECKER:  Well, I'm contesting in the
6  sense that if he did not provide the information, and
7  that was what was said to the officer, then I will
8  concede that part of it.
9      THE COURT:  Right.
10      MR. HETZNECKER:  But, we do have the
11  information today.
12      THE COURT:  Okay.  Fine.  So, why don't we do
13  this?  Now, as to B and D, Ms. Fisk, why don't you go
14  forward with those two?
15      MS. FISK:  Certainly, Your Honor.  Your
16  Honor, with regard to B, the condition being to follow
17  the instructions of the probation officer.  On that
18  date, after it appeared to the probation officer that
19  the defendant was attempting to hide car keys that he
20  brought into probation with him by keeping them
21  secreted in his glove, he went through the
22  magnetometer, it kept going off.
23      He then took off his gloves, put them on the
24  side, walked through, there was no metal detector
25  reaction, and it was only after Mr. Bergmann wanded the

13

gloves and found the keys hidden in the gloves that the

defendant provided a statement that he was driving a

car he had not previously given information about.

Mr. Bergmann, at that time, directed the

defendant to provide him with all the information

regarding that car, and from that date, on February

23rd, to today's date, April the 7th, the defendant has

failed to comply with that instruction of the probation

officer.

No additional information has been

forthcoming, and that is despite the fact that there

have been, as I understand it, additional contacts

between Mr. Bergmann and the defendant since that time.

So, with regard to his failure to follow the

instructions of the probation officer to provide the

information, the defendant has failed to comply.

THE COURT:  Okay.  So, we are talking about

the second paragraph, specifically, "The defendant was

instructed to provide the officer with a license plate

number," and he hasn't provided that information.

MS. FISK:  That's correct.

THE COURT:  Okay.

MS. FISK:  No further information has been

forthcoming.

THE COURT:  Okay.  Let's see.  How about as

14

1  to D?

2          MS. FISK:  With regard to D, Your Honor, Mr.

3  Bergmann received photographs, as is referenced in one

4  of the admitted sections, I believe it's the leaving

5  the state violation.  I believe it's -- well, actually,

6  it's -- well, in any event, Mr. Bergmann was provided

7  photographs -- oh, in condition -- violation A, which

8  has been admitted, of the defendant at a party in

9  Delaware, in the summer of 2008.

10          The defendant -- and ultimately, Mr. Bergmann

11  was able to confirm by a police report filled out from

12  a stabbing that occurred at that party in the summer of

13  2008, that the defendant was, indeed, there.  He also

14  heard the defendant talking about that party in

15  Delaware in some of the phone conversations that are

16  referenced.

17          In one of photographs, and I would mark it as

18  Government Exhibit 1 for purposes of this hearing --

19          MR. HETZNECKER:  Can I see it?

20          MS. FISK:  Certainly, a copy has just been

21  given to you in the discovery.

22          MR. HETZNECKER:  All right.  Let me look at

23  it right now.

24          MS. FISK:  Okay.  In this photograph, Your

25  Honor, and Mr. Bergmann would so testify, Mr. Bergmann

15

1    knows all three men, as I understand it, in that

2    photograph.

3         The gentleman in the center is this

4    defendant.  The gentleman standing, as you're looking

5    at the photograph, to the right, is another federal

6    convicted felon on supervised release by the name of

7    Alshana Mews (ph).  They were  I would note on

8    supervised release at the same time.

9         The government has no other information

10   linking the defendant to Mr. Mews, and can offer no

11   further information showing prior contacts with each

12   other.

13         I would note that the third individual in

14   that photograph has been killed, or has since deceased.

15   I believe he was murdered, and is not a subject of this

16   inquiry.

17         But, Alshana Mews is, indeed, and was in the

18   summer of 2008, a federal felon, as was this defendant.

19   The nature of the photograph, frankly, is an indication

20   that it appears, and that is all that the government

21   can say, they knew each other.

22         When the defendant was shown that photograph

23   by Mr. Bergmann on March 9th of 2010, he was first

24   asked if he knew Mr. Mews.  The defendant said he

25   didn't know him.

16

1    The defendant was also asked on that same

2  occasion, where was this party, and the defendant said

3  it was a splash party for his friend who was going into

4  the NFL, and that the party was in Philadelphia.

5    Mr. Bergmann asked the defendant specifically

6  if the party was in Delaware.  The defendant said it

7  was not, and then said "Get off your butt and find out

8  yourself," and "I do not talk to law enforcement."

9    It was in response to that offer by the

10 defendant that Mr. Bergmann then went to Delaware and

11 was able to obtain the police report, which showed

12 that, indeed, the defendant was interviewed as a

13 witness on that same day that that photograph was

14 taken, because there was a stabbing at that pool party.

15    But, with regard to the defendant's

16 consorting with other felons, that photograph, the

17 nature of that photograph and their joint presence at

18 this pool party for the defendant's friend, which he

19 admitted it was, is all the evidence the government

20 offers.

21    THE COURT:  Okay.  Mr. Hetznecker, how would

22 you like to proceed?

23    MR. HETZNECKER:  At this point, I would like

24 to cross-examine the officer.

25    THE COURT:  Okay.  Mr. Bergmann, would you

1   want to take the stand?

2         KENNETH BERGMANN, Defendant's Witness, Sworn.

3         COURTROOM DEPUTY:  Please state your name.

4         THE WITNESS:  Kenneth Bergmann, United States

5   Probation Officer for the Eastern District of

6   Pennsylvania.  Good morning, Your Honor.

7         THE COURT:  Okay.  Good morning.  Please be

8   seated, Mr. Bergmann, and let's proceed with

9   cross-examination.  We will deem the proffer by Ms.

10   Fisk as your direct examination.

11         MR. HETZNECKER:  Thank you.

12                 CROSS-EXAMINATION

13   BY MR. HETZNECKER:

14   Q   Good morning, Mr. Bergmann.

15   A   Good morning.

16   Q   Mr. Bergmann, that proffer just offered by Ms. Fisk

17   regarding the conversation you had with my client was

18   what date?

19   A   I would have to look at my notes, I don't have my

20   notes in front of me.  I believe it was March of this

21   year.

22   Q   March of this year.

23         THE COURT:  Ms. Fisk, would you make the

24   notes available to Mr. Bergmann, please?

25         MS. FISK:  Certainly.

Mr. Bergmann - Cross                    18

1    (Pause in proceedings.)

2    THE WITNESS:  I'm sorry, what part were you -

3 asking about?

4 BY MR. BERGMANN:

5 Q   The last part of the proffer, which there was some

6 questions about the photograph.  That conversation with

7 my client occurred on what date?

8 A   March 9th, 2010.

9 Q   Was that his regular visit?

10 A   It was a scheduled office visit, yes.

11 Q   All right.  The previous scheduled office visit was

12 what date, February 23rd?

13 A   Yes.

14 Q   All right.  Was that a regular office visit, or was

15 that a special office visit on the 23rd?

16 A   I don't understand what you mean by special.

17 Q   Well, let me ask, how often does he report, is he

18 supposed to report to you?

19 A   It all depends.  He doesn't have any schedule.

20 We'll setup dates, whether it's once or month, or if

21 there's a question I need to ask him, I may call the

22 individual in more often, or I may go see him in the

23 field and tell him not to come into the office.

24 Q   Just so we are clear about it, you see him face to

25 face approximately once a month, is that correct?

1   A    Approximately.  If there's issues, maybe more

2   often.

3   Q    All right.  You knew that he was volunteering at

4   New Pathways, or was working at New Pathways for Women?

5   A    Yes.

6   Q    You're aware of that.  Are you also aware that he

7   was going to volunteer at that same organization, as

8   well, you're aware of that?

9   A    Yes.

10  Q    All right.  So, he was both employed and also was

11  going to volunteer at that location, correct?

12  A    Yes.

13  Q    Did you make any inquiries regarding his work,

14  either on February 23rd or on March 9th?

15  A    Not that I recall, no.

16  Q    So, the focus was solely on the photograph on March

17  9th, the focus of your conversation and visit, and

18  previously on the 23rd was on the BMW, is that correct?

19  A    The focus was on the BMW?

20  Q    Yes, on February 23rd.

21  A    I wouldn't say the focus was -- the focus of that

22  interview was on the BMW?

23  Q    Yes, that's my question.

24  A    It turned into that.  I asked him, but I wouldn't

25  consider that to be the focus of that office visit.

Mr. Bergmann - Cross                              20

1   Q    All right.  So, it was a general conversation,

2   inquiry as to what he was doing and how things were

3   going?

4   A    Correct.

5   Q    All right.  Your testimony is that at some point,

6   you discovered that he had a BMW key on him, is that

7   right?

8   A    Correct.

9   Q    Did he tell you at any point that, in fact, the BMW

10  was in the possession of his mother?

11  A    Yes.

12  Q    So, he did give you that information?

13  A    Yes.

14  Q    Did he put the BMW on his statement, his monthly

15  statement, as a car that he would drive from time to

16  time?

17  A    I would have to -- not prior to that.

18  Q    Well, I would like you to check.  At any time, did

19  he inform the Probation Department that, in fact, he

20  was using the BMW that was in the name of his mother?

21  A    I'm sorry, yes, that day.

22  Q    That day.  Okay.

23  A    That day.  He wrote it in as we were sitting there.

24  Q    All right.

25  A    But, did not provide me the tag number, the VIN

Mr. Bergmann - Cross                    21

1    number, the mileage.

2    Q    All right.

3    A    That's when he was asked to, you know, provide me

4    that information.

5    Q    On a future date?

6    A    No, he said the car, he would go downstairs and get

7    me that information.

8    Q    All right.  He didn't provide that information to

9    you?

10   A    No.

11   Q    All right.  Now, prior to that time, had he filed a

12   complaint against you?

13   A    Has he filed a complaint against me?

14   Q    Prior to February 23rd, did he file a complaint

15   against you?

16   A    Yes, with my supervisor.

17   Q    All right.  What date was the complaint filed?

18   A    I actually have that information over there, as

19   well.  It was prior to that date, I don't have the

20   specific date.  According to this, December 15th, 2009.

21   Q    All right.  So, just so we're clear about it, the

22   conversation that you had with him on August 26th

23   regarding the phone calls that were tape recorded from

24   the prison with him and Aaron Jones, that conversation

25   took place on August 26th, correct?

Mr. Bergmann - Cross                22

1   A    With --

2   Q    If you look at the front of your violation listing,

3   I believe it says -- I apologize, if you look at the

4   body of it, under C, the second paragraph.

5   A    Yes.

6   Q    "On August 26th, 2009 --

7   A    That's the admitted violation.

8   Q    -- this officer" --

9   A    Under the admitted violation?

10  Q    Yes.  You look at that date.

11  A    "On August 26th, this officer informed Mr.

12  Williams."

13  Q    That you knew of the recorded conversations between

14  him and Aaron Jones?

15  A    Yes.

16  Q    All right.  He conceded that, correct?

17  A    Correct.

18  Q    All right.  You informed him that at that point,

19  you did not think he should have any conversations with

20  Aaron Jones any longer, is that correct?

21  A    As it says in the petition, "A verbal warning was

22  given to Mr. Williams, informing him that he is not to

23  have any further contact with known felons."

24  Q    Right.  But, specifically the conversation with

25  Aaron Jones -- was about Aaron Jones, right?

1  A    They were the tapes that I had, but he was

2  instructed not to have any contact with any known

3  felons.

4  Q    All right.  Just so we're clear, though, the

5  conversation was focused on Aaron Jones on that date?

6         MS. FISK:  Objection, Your Honor, it's asked

7  and answered.

8         THE COURT:  Okay.  Overruled.  If he can

9  answer it.

10         THE WITNESS:  We were speaking of Mr. Jones

11  at that time.

12  BY MR. HETZNECKER:

13  Q    All right.  You had no information that, in fact,

14  he's had any conversation with Aaron since August 26th,

15  2009?

16  A    No information.

17  Q    All right.  So, from August until December, he was

18  complying with all of the rules and regulations,

19  correct?

20  A    From -- well, as far --

21  Q    As far as you knew at that point.

22  A    As far as I knew at that point, yes.

23  Q    Yes.  As far as you knew at that point, you were

24  still seeing him on a monthly basis, is that correct?

25  A    Yes, I would say so, yes.

Mr. Bergmann - Cross                    24

1  Q   All right.  Isn't it true that as a probation

2  officer, you have to make discretionary calls as to

3  whether or not a particular violation warrants notice

4  to the court?

5  A   Yes.

6  Q   So, sometimes there's a dirty urine, you don't

7  notify the Court right away?

8  A   Right, correct.

9  Q   All right.  Because, in fact, you try to find a way

10 to resolve that, is that correct?

11 A   Correct.

12 Q   Isn't it true that as of August 26th, 2009, you had

13 only been his probation officer for a short period of

14 time?

15 A   Correct.

16 Q   So, he had been on supervised release for five

17 years, or almost five years up until the time that you

18 were assigned, correct?

19 A   Since September 1st, 2005.

20 Q   All right.  So, just so we're clear, when were you

21 assigned it, if we could get the exact date?

22       (Pause in proceedings.)

23 A   I would say it looks about June of 2009.

24 Q   Okay.  So, you had only -- as of August 26th, you

25 had only been his probation officer for approximately

Mr. Bergmann - Cross                          25

1   two months, correct?

2   A    Correct.

3   Q    All right.   Other than what you have testified to,

4   he's essentially been in compliance with probation, is

5   that correct?

6   A    Correct.

7   Q    Now, December 15th, 2009, a complaint is filed

8   against you by Mr. Williams, correct?

9   A    Correct.

10  Q    That's brought to your attention by your

11  supervisor, is that correct?

12  A    Correct.

13  Q    Subsequent to that, then you go about requesting

14  the phone records from the state prison system, is that

15  correct?

16  A    I'm sorry, repeat that question.

17  Q    Subsequent to December 15th, 2009, you then

18  requested the records from the state prison system, is

19  that correct?

20  A    Correct.

21  Q    All right.   What was the nature of the complaint

22  that Mr. Williams had against you?

23  A    I'm reading it here.   Would you like me to read it?

24  Q    You can read it, sure.

25  A    "Dear Mr. Marvin Green:   We spoke some two weeks

1   ago about a relationship to Mr. Bergmann.  I would like

2   to file a formal complaint against Mr. Bergmann, who I

3   believe is a racist and has violated my rights, God

4   given.  Since I was self-employed, he did his best to

5   create a non-existent laws so I couldn't have my own

6   business, 'dump truck,'" that's in quotations.

7   Q    All right.

8   A    "Wants to harass individuals who are not on parole

9   who were doing business with me.  Asked me questions

10  about other people who I don't even know, always

11  threatening me with bogus violations, asked me where my

12  money is at.  If I was white, me or others who look

13  like me, would not have these racial profiles.  He does

14  this on a regular basis."

15  Q    All right.  Let me stop you there.

16  A    It's not done yet.

17          MS. FISK:  Well, I would ask that he finish.

18  BY MR. HETZNECKER:

19  Q    Okay.  Fine, go ahead.

20  A    "Now I'm told I can't do community service for

21  Outreach Program, or I'm going to be violated for not

22  having a job."

23  Q    All right.  Now, I assume that when you received

24  notice of this, you were offended by it?

25  A    No.

1   Q    Not at all?

2   A    No.

3   Q    You didn't feel insulted at all?

4   A    No.

5   Q    Have there been other complaints filed against you

6   as a probation officer?

7   A    Not that I'm aware of, no.

8   Q    All right.  So, this was the first time, and it

9   didn't bother you at all?

10  A    No.

11  Q    Okay.  Now, just so we're clear about this, the

12  allegations he makes about your looking for reasons to

13  undermine his business, I assume your contention is

14  that's not true, is that correct?

15  A    Yes.

16  Q    All right.  I assume that you dispute all of those

17  allegations in there, is that correct?

18  A    Yes.

19  Q    The easiest way to resolve a complaint like this

20  would be for the probation officer to transfer the case

21  to someone else?

22          MS. FISK:  Objection, Your Honor.

23          THE COURT:  Sustained.

24  BY MR. HETZNECKER:

25  Q    Now, just so we're clear about this.  Following

Mr. Bergmann - Cross                           28

1    your receipt of this -- by the way, when did you

2    receive the complaint?

3    A    I believe that day Mr. Green made me aware of it.

4    To be honest with you, this is the first time I read it

5    all the way through.

6    Q    All right.  Did you take any action following that

7    complaint?

8    A    Any action?  What do you mean?

9    Q    Did you begin an investigation of Mr. Williams at

10   that point?

11   A    No.

12   Q    When did you see Mr. Williams after that complaint

13   was filed, when was the next time you saw him?

14           (Pause in proceedings.)

15   A    He reported to the office on January 19th, 2009.

16   Q    All right.  There was nothing remarkable about that

17   particular visit?

18   A    No, nothing.

19   Q    All right.  Then the following visit would have

20   been what date, February 23rd?

21   A    Yes.

22   Q    All right.

23           MR. HETZNECKER:  I have no further questions,

24   thank you.

25           THE COURT:  Okay.  Very well.

Mr. Bergmann - Cross                    29

1       MS. FISK:  May I redirect, Your Honor, on the

2  basis of that cross-examination, which went far outside

3  the initial petition?

4                   REDIRECT-EXAMINATION

5  BY MS. FISK:

6  Q   Mr. Bergmann, I just want to explore, based on the

7  implications raised on cross-examination, why this

8  information you have has come forward.

9       Your request for the updated prison tapes,

10  did that follow your independent receipt from other

11  unrelated law enforcement of some evidence having to do

12  with these violations?  I'm making specific reference

13  to the colored photographs.

14  A   Right.  It was in conjunction with.  It was really

15  two independent --

16  Q   What happened first, what did you get first?

17  A   I believe first I received -- I requested an

18  inquiry about the prison tapes, and I received the

19  pictures first.

20  Q   So, you received the pictures first?

21  A   Right, I believe so.

22  Q   All right.  So, you received pictures that showed

23  the person you were supervising, is that correct?

24  A   Yes.

25  Q   At that time when you received those pictures, you

1  had already listened to telephone calls the defendant

2  had had with Aaron Jones from some time before, where

3  he had talked about a party?

4  A    Correct.

5  Q    Would that be fair?

6  A    Correct.

7  Q    Would it be fair to say that then when you received

8  those photographs, you believe that they related to

9  that party that you had already heard the defendant

10 speak about?

11 A    Correct.

12 Q    After you received those pictures from other law

13 enforcement who had seized them, it would be in a car

14 stop, would that be right?

15 A    Yes.

16 Q    That you then asked for updated phone records to

17 see whether the defendant was continuing his contacts

18 with other felons?

19 A    Mr. Jones or any other felon, yes.

20 Q    And that is when you learned that, indeed, he was

21 despite the warning he had been given the prior summer?

22 A    Correct.

23 Q    Then following the receipt of both of those

24 pictures, and those updated phone contacts, you

25 confronted the defendant about them in March, and he

Mr. Bergmann - Redirect                31

1   lied to you and told you that that party was in

2   Philadelphia?

3   A    Correct.

4   Q    Incidentally, the letter that you just read, the

5   complaint that the defendant made, had to do with your

6   refusing to let him keep a job, so if I can just

7   explore that for a moment.

8        Prior to the defendant's -- the defendant's

9   current job, you were asked about his working at New

10  Pathways?

11  A    Correct.

12  Q    Are you aware of how many hours a week he is

13  formally employed?

14  A    I believe it's twelve hours a week.

15  Q    Okay.  Have you asked the defendant to obtain full

16  time employment?

17  A    We have.

18  Q    Does twelve hours a week constitute full time

19  employment?

20  A    No.

21  Q    Prior to this current position at New Pathways,

22  what employment had the defendant reported to you?

23  A    He reported to us that he was operating a dump

24  truck business, a trucking business.  He actually had a

25  card that said Williams Trucking.

Mr. Bergmann - Redirect                    32

1   Q   Did you confirm that the defendant had a dump

2   truck?

3   A   Yes, he did have one.

4   Q   Did you confirm that the defendant was leasing that

5   dump truck to some other person on a full time basis?

6   A   That's what we were attempting to do, and we were

7   asking him about that.

8   Q   So, that was your understanding, that he was

9   leasing it on a full time basis so that he wasn't

10  actually doing any daily work with regard to his

11  ownership of the dump truck?

12  A   Correct.

13  Q   Was it your instruction to the defendant that that

14  did not constitute full time employment?

15  A   Correct.

16  Q   That appears to be the nature of the complaint that

17  he has in this letter?

18  A   Correct.

19  Q   All right.  Incidentally, with regard to that

20  employment, his current part time employment, and the

21  defendant's other means of support, since he is now

22  only working twelve hours a week, have you inquired of

23  the defendant to provide you with information about how

24  he is maintaining his current lifestyle?

25  A   I have asked him questions of that nature, and he's

Mr. Bergmann - Redirect                    33

1   indicated to me that, you know, upon his release from

2   prison, he had hit the lottery, and that he was living

3   off of that money, as well, and that he had family

4   support in addition.

5            THE COURT:  Now, that was thirty thousand

6   dollars?

7            THE WITNESS:  Correct, Your Honor.

8            THE COURT:  Okay.

9   BY MS. FISK:

10  Q    That was in 2005?

11  A    I believe so, yes.

12  Q    Have you asked the defendant to provide you with

13  any records or documents showing how much of that

14  thirty thousand dollars remains?

15  A    I've asked him where he's kept the money at,

16  because he doesn't indicate it on his monthly reports

17  in any bank accounts.

18  Q    Okay.

19  A    He's told me, you know, he could be keeping it in a

20  box in his bedroom, or he could be, you know, it could

21  be anywhere, you know, and he hasn't told me where he's

22  keeping the money.

23  Q    Thank you, sir.

24           MS. FISK:  I have no further questions, Your

25  Honor.

Mr. Bergmann - Redirect                         34

1          THE COURT:  Any recross?

2          MR. HETZNECKER:  Just recross.

3                    RECROSS-EXAMINATION

4    BY MR. HETZNECKER:

5    Q    He informed you that he filed taxes on that money?

6    A    Yes.

7    Q    You have no reason to believe that he has not,

8    correct?

9    A    No.

10   Q    All right.  Additionally, you're aware or he

11   informed you that he had a personal injury case?

12   A    I don't recall that.  I'm not saying that he

13   didn't, but I don't recall.

14   Q    But, it was before -- the paperwork, or

15   confirmation of that, was before you were his probation

16   officer if?

17   A    It could be.  I don't recall it personally.

18          MR. HETZNECKER:  I have no further questions,

19   thank you.

20          THE COURT:  Mr. Bergmann, you may step down,

21   thank you.

22          THE WITNESS:  Thank you, Your Honor.

23          (Witness excused.)

24          THE COURT:  Anything further, Ms. Fisk?

25          MS. FISK:  No, Your Honor.

35

1    THE COURT:  Okay.  Mr. Hetznecker, any

2  evidence that you want to offer?

3    MR. HETZNECKER:  Your Honor, may I have a

4  moment?

5    (Pause in proceedings.)

6    MR. HETZNECKER:  No, Your Honor, no further

7  evidence.

8    THE COURT:  Okay.  Very well.  So, we would

9  then have argument now?

10    MR. HETZNECKER:  Yes, Your Honor.

11    THE COURT:  Why don't we have Ms. Fisk go

12  first, and as I understand it, violation A and --

13    MS. FISK:  C.

14    THE COURT:  -- violation C were admitted.

15  Violation B and violation D are being contested.

16  Violation E, we don't really know, and I have the case

17  here, whether the case of United States versus Maloney

18  affects this.

19    I will give you an opportunity to review it

20  before we go further on violation E.  So, let's lay

21  that aside for a minute.

22    MS. FISK:  Very well.  So, we will not even

23  introduce evidence with regard to that one.

24    THE COURT:  Yes, we will not go to E.

25    MS. FISK:  Fine, all right.

36

1    THE COURT:  We'll go to B and D.

2    MS. FISK:  B and D.

3    THE COURT:  Then we'll do mitigation if he is

4 convicted on any of the counts, so let's just focus on

5 whether or not there has been a violation.

6    MS. FISK:  Your Honor, the government is of

7 the position that sufficient evidence has been

8 presented with regard to the two contested violations.

9    With regard to B, the defendant was clearly

10 told to provide information about the car.  The

11 defendant was told to call later that day.  He did not,

12 he still has not.

13    On that day, when this hidden key, and I

14 submit was hidden and the defendant was trying not to

15 disclose it, when it was discovered by Mr. Bergmann in

16 the glove, the defendant at that time added the car to

17 his list, and other than the fact that it's a BMW, has

18 never provided any further information, and has failed

19 to follow the instruction of the probation officer.

20    With regard to D, frankly, Your Honor, the

21 government rests on its evidence, and that is that that

22 is a photograph of people at a party.  It appears, and

23 again, it appears to show that these are individuals

24 who know each other, they are standing together,

25 they've got towels draped around their shoulder at a

37

1    pool party.

2            THE COURT:  So, you are relying on the photo?

3            MS. FISK:  That's correct, Your Honor.  The

4    photograph, and it was uncontested that the man in the

5    pink shirt on the right side of the photograph is

6    Alshana Mews, a federal felon who was on supervised

7    release.

8            THE COURT:  How would you demonstrate that

9    the defendant knew that Mr. Mews was a felon?  In other

10   words, you could have a picture taken with another

11   person at a party, that sometimes happens --

12           MS. FISK:  Yes, sir.

13           THE COURT:  -- and then it turns out that

14   that person is a convicted felon, or worse, or better,

15   as the case may be.  In other words, how do you connect

16   that out?

17           MS. FISK:  Well, frankly, Your Honor, it's

18   the defendant's burden to make sure that he is not

19   associating with known felons.  He is on supervised

20   release, he is the person who has to --

21           THE COURT:  Well, what's he going to do, ask

22   everybody he meets?

23           MS. FISK:  Or ask the person who is throwing

24   the party whether there are going to be any other

25   felons there, and if there are, I can't come.  Well,

38

1  frankly, he wasn't supposed to go, anyway, because it
2  was in Delaware.
3           THE COURT:  Well, that's a different problem.
4           MS. FISK:  But, beyond that --
5           THE COURT:  I don't think a photograph -- we
6  had those gate crashers at the White House, and they
7  had their picture taken with the vice president, and
8  people assume on that kind of setting that people are
9  authorized to be there.  I don't know whether you can
10  just simply rely on the picture, in the absence of some
11  prior relationship or connection.
12           MS. FISK:  I have no other evidence with
13  regard to that, Your Honor.
14           THE COURT:  Okay.  Very well.  Okay.  I don't
15  think I can, just on that basis, find him by the
16  preponderance of the evidence as to D.  So, let's go to
17  B.
18           MS. FISK:  That's as to D.
19           THE COURT:  Yes, exactly.
20           MS. FISK:  Yes, sir.
21           THE COURT:  B, it seems to me, you know, has
22  he provided the information as we sit here today?
23           MR. HETZNECKER:  Well, this is where it gets
24  a little complicated.  I have the information today.
25           THE COURT:  Right.

39

1    MR. HETZNECKER:  He did not provide the

2    information requested on that date, but I also want

3    to --

4    THE COURT:  On that day, or since that day

5    until today?

6    MR. HETZNECKER:  Well, I have the information

7    today.

8    THE COURT:  Yes, but up until --

9    MR. HETZNECKER:  But, up until today,

10   correct.

11   THE COURT:  Up until today, isn't that a

12   violation?

13   MR. HETZNECKER:  Your Honor, technically, it

14   probably is.

15   THE COURT:  Right.

16   MR. HETZNECKER:  But, the reason why I

17   challenge it is because, as Your Honor knows, I was

18   appointed last week.  I spoke to Mr. Williams, I asked

19   him to get the information.  He has the information

20   now, so technically speaking, on that day, up until I

21   was appointed, up until today, it is a violation,

22   technically.

23   But, I think to characterize it, the way it's

24   been characterized, I think is a little disingenuous.

25   Number one, if he was going to conceal the use of the

40

1   car, he wouldn't show up.

2         He would take the subway or get somebody to

3   drop him off.  He wouldn't show up at probation with a

4   key that, of course, is going to go off in the metal

5   detector, it's metal.  He can't conceal it in a pocket,

6   in a glove.  I mean, the whole thing is kind of

7   ludicrous.

8         Secondly, he actually reports it that day.

9   He says yeah, I am using the BMW.  So, the only

10  question, the narrow issue is did he then provide,

11  based on that information given to Mr. Bergmann, did he

12  provide the subsequent requested information, that is,

13  the license number for the car, and ownership of the

14  car.  No, he did not do it, but I have it today.

15         THE COURT:  Okay.  Open and shut.

16         MR. HETZNECKER:  Right, but I have it today.

17         THE COURT:  Okay.  Well, that may go to

18  mitigation.

19         MR. HETZNECKER:  Right.

20         THE COURT:  But, it seems to me he was asked

21  for the information.  He's on supervised release, he's

22  not a free agent.

23         MR. HETZNECKER:  Correct.

24         THE COURT:  If he was a free agent, we have a

25  different situation.

41

1          MR. HETZNECKER:  Absolutely.

2          THE COURT:  But, the probation officer has a

3     duty to investigate.  He asked for information, it

4     wasn't provided, I don't know what else can we say.

5     Now, he has it today, well, congratulations, that may

6     go to a different point, but he didn't provide it when

7     he was supposed to.

8          Let us assume that the information, unlike

9     apparently the innocent explanation that you have,

10    hadn't been so innocent.  The probation officer then

11    would have been derelict in his duty if he hadn't

12    investigated.

13         MR. HETZNECKER:  Correct.

14         THE COURT:  So, that's the purpose of the

15    investigation.  It's not to say that the man was

16    violating the law, it's for the probation officer to

17    carry out his duty.

18         The same as with the financial information,

19    if you don't provide financial information, it doesn't

20    mean there's something odd going on, but if you don't

21    provide it, he cannot do his job.  So, I think that

22    there isn't much of an explanation there.

23         Now, is there anything else then that you

24    would like to say?  It seems to me that as to A, C, and

25    B, the defendant has either admitted or evidence has

42

1  been proffered, which would indicate by the

2  preponderance of the evidence that he had violated the

3  conditions of supervised release.

4          MR. HETZNECKER:  Correct.

5          THE COURT:  Okay.  I so find.  Now, let's

6  proceed then, and I'm going to not consider E.

7          MS. FISK:  Your Honor, if I just may note,

8  with regard to E --

9          THE COURT:  Yes?

10          MS. FISK:  -- Mr. Bergmann has provided me a

11  summary --

12          THE COURT:  Right.

13          MS. FISK:  -- of the Maloney matter, which

14  noted that as a result of Maloney, as I understand it,

15  the summary is that officers should not charge

16  unreported conduct with law enforcement as a violation

17  of that standard condition, unless the contact involves

18  an arrest or questioning with respect to a criminal

19  offense.

20          THE COURT:  Well, I don't know.  I got the

21  case here.  I'll give Mr. Hetznecker an opportunity to

22  review it.  I'll take a short break, and I'm sure he'll

23  give me his view.

24          MS. FISK:  Very well, Judge.

25          THE COURT:  We'll give you a copy, as well.

43

1          MS. FISK:  Sure, Judge.

2          THE COURT:  It's only a couple of pages on

3     that particular issue.

4          MS. FISK:  Okay.

5          THE COURT:  So, why don't we take a break,

6     and we'll get the benefit of your advice here?

7          MR. HETZNECKER:  Thank you, Your Honor.

8          MS. FISK:  Thank you, Judge.

9          THE COURT:  Okay.

10         (Recess, 10:50 a.m. to 11:08 a.m.)

11         THE COURT:  Okay.  Please be seated.  Okay.

12    Ms. Fisk, what do you think.

13         MS. FISK:  Your Honor, I believe that the

14    opinion permits the Court to consider the evidence.

15    According to the Third Circuit under the circumstances

16    of that case where the defendant received a summary

17    citation for peddling without a license, the court

18    noted it was a factual determination that they made

19    that the contract was too insufficient to clearly be

20    questioning by police.

21         In this case, it is very different.  In this

22    case the defendant was at a private home where a

23    stabbing took place.  The New Castle Police Department

24    came to the location and took statements and questioned

25    every individual at the home about this clear criminal

44

1  procedure.  This is a far more than a licensing

2  provision, far more than a traffic violation when there

3  is an aggravated assault, a stabbing.

4        One of the people who were questioned about

5  that criminal incident was this defendant who told the

6  police, in accordance with the police report that Mr.

7  Bergmann has obtained --

8        MR. HETZNECKER:  Objection, objection, it is

9  not in the record.

10        MS. FISK:  And I am happy to Mr. Bergmann

11  testify to it then, Judge.

12        THE COURT:  Well, okay, the question is --

13  the point, I don't think that's necessary to get there.

14  The question is whether or not the provision in the

15  standard conditions of supervised release which --

16        MS. FISK:  Is overly broad.

17        THE COURT:  -- required that the person on

18  probation or supervised release report arrest or

19  questioning, whether this is a type of a situation

20  which would trigger that provision.

21        It isn't what the result was, but it's

22  whether or not there is notice that when you are

23  questioned under these circumstances, it would trigger

24  the obligation to report.

25        MS. FISK:  The Third Circuit does not say

1   that that condition is in and of itself improperly --

2          THE COURT:  Now, what I don't understand

3   here, and maybe you could tell me, this may be the

4   Third Circuit in thinking about it, but whether or

5   not -- the form wasn't modified.  In other words, the

6   words are still the same arrest or questioned.

7          Shouldn't this decision have led to a

8   modification of the form that would say questioning of

9   a suspect in a pending criminal investigation, and that

10  would have put him on notice, but he would have had no

11  more notice than Mr. Maloney had in his case.

12         MS. FISK:  Well, first of all --

13         THE COURT:  It's just that afterwards we can

14  now see that it fell within it.  I mean, does that cure

15  the vagueness problem?

16         MS. FISK:  Your Honor, I would note first

17  that the defendant's supervised release and the

18  conditions were imposed prior to this opinion.

19         THE COURT:  Right.

20         MS. FISK:  So that they existed pre-Maloney

21  opinion.  The Maloney opinion also does not say that

22  that condition in and of itself is unduly vague.  What

23  it says is under the facts of this arguable violation,

24  that contact was too vague.

25         The Court is right, I mean there can be a

46

1  more specific condition of supervised release that

2  would eliminate this issue.  But, with regard to this

3  condition as it is currently written, the Court does

4  not say there cannot be an appropriate violation of a

5  condition prohibiting questioning by police.

6        Under the facts of the Maloney case, they say

7  that was an inadequate kind of contact, but then they

8  set out the kinds of contact that would satisfy that

9  same language.

10        It is the position of the government that in

11  this case, the specific contact that the defendant had,

12  that is specific questioning of him by police about a

13  criminal incident where he was present, constitutes

14  that kind of contact which sufficiently places him on

15  notice.

16        THE COURT:  Let me ask you something.  Maybe

17  Mr. Bergmann knows, or maybe Mr. Bergmann's supervisor

18  knows it.

19        The thirteen standard conditions adopted by

20  the Court, where did we get those?

21        MR. BERGMANN:  Where did we get those, Your

22  Honor?

23        THE COURT:  Yes.  In other words, if I recall

24  that form, it seems to be a national form?

25        MR. BERGMANN:  It is a national form, Your

47

Honor.

THE COURT:  So, that requires perhaps the Criminal Business Committee of the Judicial Conference to amend the form for that.  I guess all you folks can do is try to interpret it as best as you can.

Okay.  Well, let me hear the defendant's view on that.

MS. FISK:  I'm sorry, Your Honor.

THE COURT:  Sure.

MS. FISK:  I just wanted to point out one additional thing, and that is when the defendant was even in March of this year given the opportunity to correct a failure to report, whether it was unduly vague or not --

THE COURT:  Yes.

MS. FISK:  -- when he was asked in March of this year, was that party in Delaware, he continued to insist it was in Philadelphia and still did not report the contact that he had back in 2008.

THE COURT:  Okay.

MR. HETZNECKER:  Your Honor, I think you hit the nail on the head on the question of vagueness, and that is subsequent to the decision, was the notion of question -- the rest is clear, but the notion of question then modified such that it puts a supervised

48

1   release or probationer on notice that, in fact, they

2   are to report it.

3            Ms. Fisk seems to characterize this as if he

4   was a suspect.  The stabbing occurred outside the

5   house.  He's not even near it.  So, if a police officer

6   approaches and says, were you present at the scene, did

7   you see anything, here is my name, and I didn't see

8   anything, is that questioning?  Does that fall within

9   the ambit of questioning.  Does that then put him on

10  notice?

11           Ever under Ms. Fisk's argument, the facts

12  don't establish that he is on notice.  I think the

13  Maloney decision is directly on point, because what the

14  court says very clearly is with the interpretation,

15  "The proximity of the terms arrest and questioned and

16  the condition demonstrates that Maloney's

17  interpretation was not unreasonable under the

18  circumstances," and likewise in this particular case.

19           With no modification post-Maloney, with the

20  vagueness existing throughout prior to Maloney and

21  continuing on through, and as Your Honor says has it

22  been changed since.

23           Now, whether it is a national form or not,

24  the question is whether or not he is on notice, my

25  client is on notice that, in fact, a police officer

49

1   arrives at the scene and says oh, by the way, an

2   incident occurred.  What is your name and did you see

3   anything, here is my name and I didn't see anything,

4   does that then put him on notice to notify under that

5   condition?

6         Under the vague reading, as <u>Maloney</u> points

7   out, the vague interpretation, the obvious broad

8   interpretation based on the vagueness of the

9   phraseology, does that put him on notice that he is

10  required to tell him, no, it does not, and I would ask

11  that Your Honor find him not guilty of that particular

12  violation.

13        THE COURT:  Well, it does seem to me that if

14  the <u>Maloney</u> court was concerned with vagueness, nothing

15  has been done about it, other than to try to apply it

16  retroactively, that is, after the event, then we try to

17  figure out whether or not it was reasonable.  I don't

18  think that helps the matter along.

19        If the problem is vagueness, then it ought to

20  be made more express by those who have the authority to

21  do so.  Maybe I would modesty take it upon myself to

22  suggest to the committee on criminal rules, the

23  Criminal Business Committee of the Judicial Conference,

24  that this matter be addressed one way or the other,

25  because I think we are going to continue to have these

areas.

So, I am going to sustain the objection to that on the principle that the enforcement of the criminal laws should be clear that the vagueness here has not yet been correctED

Although I appreciate that is a different situation than <u>Maloney</u> but, again, it was not in which, as far as we can tell, the defendant himself was a suspect, maybe he was an eyewitness to the case, but I think it's something that should be clarified.  So, objection sustained.

So, we are left with A, B, and C.  So, Ms. Fisk, what should be the appropriate punishment in this case?

MS. FISK:  Your Honor, I would note and I agree that we are left with A, B, and C.  With regard to B, in addition to the evidence that this Court found, I would note that there is additional evidence of the defendant not answering truthfully all inquiries by the probation office, and under the concept of relevant conduct, I would suggest to the Court that there is this additional evidence, that is the defendant denying that the party was in Delaware, refusing to respond to the -- I'm sorry -- in terms of lying, refusing to answer truthfully the question about

51

1   the location of the party, and in terms of generally

2   just refusing to cooperate with probation, refusing to

3   provide financial information that has been requested,

4   apparently seeking to hide, and then when caught

5   providing information about a vehicle.

6          He said directly to the probation officer,

7   despite being warned not to speak to his co-defendants,

8   co-defendants from a violent criminal organization and

9   other felons, the defendant said to him point blank,

10  these are people I've grown up with, I'm not going to

11  stop.

12          THE COURT:  Two things.  Number one is, when

13  is the period of supervised release scheduled to

14  expire?

15          MS. FISK:  It is scheduled to expire I

16  believe August or September of this year?  August 31st

17  of this year, Your Honor, is the natural expiration

18  date.

19          THE COURT:  Okay.  And what are the

20  sentencing options?

21          MS. FISK:  For C violations for this

22  defendant who was in Criminal History Category I, from

23  an A felony violation, the sentencing guidelines are

24  three to nine months with a statutory maximum of five

25  years.  The government is requesting a sentence in the

1   middle of that range, not at the higher end, but

2   certainly not the lower end.

3           The defendant continued to lied, and I would

4   note, Your Honor, that as we stand here now, we still

5   have not gotten the information about the BMW, despite

6   Mr. Hetznecker's representations, let's be candid.

7           MR. HETZNECKER:  Here it is.

8           THE COURT:  Okay.  Okay.  Let's control

9   yourself, okay.

10          MS. FISK:  The defendant's continual

11  behavior, blatant disregard for probation --

12          THE COURT:  Now, would this require a

13  reimposition of a period of supervised release.

14          MS. FISK:  The government would ask first for

15  a period of approximately six months, about in the

16  middle of that guidelines for the defendant to serve

17  six months to perhaps reinforce in him the requirement

18  that he does have to comply with the terms and the

19  conditions that probation plays.  Apparently he doesn't

20  like having an active probation officer.

21          THE COURT:  But, what is going to happen at

22  the end of the six months, that is what I am asking?

23          MS. FISK:  The government asks that the Court

24  also pose a new two year term of supervised release,

25  following that sentence.

53

1    THE COURT:  And what is the option available

2 to the Court in terms of the length of the new period?

3 Is it limited to two years?

4    MS. FISK:  No, Your Honor, it can be up to

5 five years, less any period of imprisonment imposed.

6    THE COURT:  So, it would be five years minus

7 if a custodial period is imposed now?

8    MS. FISK:  Correct.  If the Court opts to

9 impose a period of six months custody, the Court can

10 then impose --

11    THE COURT:  Let me ask Mr. Bergmann.  Mr.

12 Bergmann, has -- and I will talk to Mr. Hetznecker

13 about it, it doesn't really bode well, but there is no

14 criminal conduct as far as we can tell, but it doesn't

15 bode well.

16    Other than these violations, is there some

17 adjustment that the defendant -- I mean, my concern is

18 really more into the future, because I don't think this

19 really bodes well for the future.

20    What conditions of supervised release would

21 be warranted here, and what is the defendant's

22 adjustment otherwise?  Where does he live?

23    MR. BERGMANN:  Your Honor, as far as

24 conditions, Your Honor --

25    THE COURT:  Where does he live?

54

1      MR. BERGMANN:  Your Honor, he apparently

2  resides with his mother I believe in the Mt. Airy

3  section of Philadelphia.

4      THE COURT:  Okay.

5      MR. BERGMANN:  A condition that the probation

6  office would request is that a financial reporting

7  condition be imposed, that Mr. Williams be required to

8  report his finances and where his finances are being

9  held at, whether they are in a bank, whether they are

10  being privately held in his residence or what have you.

11      As far as his adjustment, Your Honor, I would

12  speak to the fact that Mr. Williams clearly has told me

13  that he doesn't trust law enforcement.

14      THE COURT:  Okay.  Well, maybe, you know, he

15  has reason for it.  But, he has to comply with the

16  conditions, that is the important thing.  Whether he

17  likes it or not, I don't think you can require somebody

18  to like law enforcement.

19      MR. BERGMANN:  Correct, Your Honor.

20      THE COURT:  So, financial reporting, maintain

21  residence at his mother's house.  How about full-time

22  employment?

23      MR. BERGMANN:  Your Honor, a condition of

24  supervision is that he work regularly.  That is a

25  general condition, that he maintain regular employment.

55

1          THE COURT:  Well, what does that mean?

2          MR. BERGMANN:  Again, Your Honor --

3          THE COURT:  He works twelve hours a week.

4          MR. BERGMANN:  Again, that's why the

5   probation office -- because he did get that job, that's

6   why the probation office didn't charge him with that

7   violation because that is regular employment.  He is

8   now working twelve hours a week.

9          You know, Mr. Williams, I believe is an

10  intelligent man, well spoken, and I believe he is able

11  to work more regular employment at a full time job.

12         THE COURT:  Well, now the purpose of that

13  condition is to be able to identify the source of

14  support, unless he has independent sources of support

15  that he can identify, otherwise, what is he living on.

16         MR. BERGMANN:  Correct, Your Honor.

17         THE COURT:  Okay.  So, there would be, it

18  seems to me, a requirement that he work at least twenty

19  hours a year, unless he can identify that he has an

20  independent source of support.

21         MR. BERGMANN:  That would be correct.

22         THE COURT:  Okay.  I mean, if somebody is

23  rich, maybe they don't have to work, but if they don't

24  have the money and they are living in a certain

25  lifestyle and they are convicted felons on supervised

56

1   release, I think you have a duty to investigate the

2   sources of support.

3        Okay.  So, the question is whether or not

4   there should be a custodial term.  Now, can the period

5   of supervised release be extended without a revocation.

6   You would need to have a revocation and, at least, as I

7   recall, one day or something like that of custodial,

8   right?

9        MR. BERGMANN:  Correct, Your Honor.

10       THE COURT:  Okay.  Mr. Hetznecker.  You know

11  my concerns.

12       MR. HETZNECKER:  I do.

13       THE COURT:  This is not going well.

14       MR. HETZNECKER:  I understand.

15       THE COURT:  Okay.  And it is going to get

16  worse.

17       MR. HETZNECKER:  I don't want to do that,

18  Your Honor.

19       THE COURT:  -- and Mr. Williams' attitude

20  isn't helpful, but it's his attitude.  We are not here

21  to change attitudes, but we are here to seek

22  compliance.

23       I am not interested in a situation of

24  punishing somebody for the sake of punishing him.  So,

25  I'm actually interested in creating a system that he

1    can comply with.  But, if he doesn't comply with it, he

2    is going to be in trouble.

3          MR. HETZNECKER:  Understood, and if I could

4    address just the overall perspective here.  I want to

5    make it very clear to the Court, that for almost five

6    years he complied.  All of the financial information

7    was provided to previous probation officers.

8          He had a father who passed away.  His mother

9    is present in the courtroom by the way.  The BMW was

10   issued in her name.  That is information that has been

11   provided with another individual.  She drives the car

12   primarily.  He does use the car, there is no question

13   about that.  So, I think that should resolve that.

14         With respect to the finances, when his father

15   died while he was incarcerated, there was money set

16   aside for him.  That money was set aside and he has

17   lived off the money.

18         He has also tried to get employment.  I have

19   a letter from the City of Philadelphia dated October

20   17th, 2008 stating "Dear Mr. Williams: Congratulations,

21   you have passed the examination for the position of

22   asphalt raker.  Your score is ninety-eight, your rank

23   on the eligible list is 7.000."

24         This letter indicates that he has been

25   looking for full-time work on an ongoing basis.  This

58

1   is a difficult economy.

2        THE COURT:  Now, has he --

3        MR. HETZNECKER:  He is still on the list,

4   Your Honor, for this job.

5        THE COURT:  Has he filed income tax returns

6   for the last five years?

7        MR. HETZNECKER:  He indicates that he has.  I

8   don't have those with me.

9        THE COURT:  Okay.  We will have to provide

10  those, as well.

11       MR. HETZNECKER:  But, apparently they have

12  been provided to probation already.  I believe they

13  have already been provided in the past.

14       THE COURT:  Okay.

15       MR. HETZNECKER:  But, if they don't have

16  copies of them, my client assures that he will get

17  those copies.  But, I think it's important to put this

18  in the proper perspective.

19       He has looked for work, and when he couldn't

20  find work, he tried to start his own business, and that

21  was the dump truck business, and I think there has been

22  an implication somehow that he's got funds that are

23  nefarious.

24       He has been complying essentially with

25  probation all the way along.  Now, did he know these

59

1  people twenty years ago that are incarcerated?  Yes,

2  they call from time to time and ask for favors, can you

3  do this, can you tell so and so, none of it is

4  criminal.

5        In fact, all the tape recordings that the

6  government has, and not one tape recording was

7  presented --

8        THE COURT:  He cannot talk to them.  He

9  cannot talk to them.

10       MR. HETZNECKER:  Correct, and I am not

11  advocating that he should.  I just want to put it in

12  proper perspective.

13       THE COURT:  Okay.

14       MR. HETZNECKER:  So, if in fact, he did have

15  those conversations, none of them involved criminal

16  activity at all, so he will not talk to them.  So, if

17  people had called him and from time to time he said I

18  can't talk to you anymore, he's not going to do that

19  anymore, he understands that.  He is going to

20  completely comply with all of the rules and regulations

21  of probation.

22       But, I want to put this is perspective.  He's

23  got a letter, "Dear Mr. Bergmann:" dated January 19th,

24  2010, four days before the confrontation he had over

25  the BMW with Mr. Bergmann.

1    "I am providing you with the dates that

2  Derrick Williams volunteered at our offices since

3  Wednesday, December 16th, 2009."  This is Y-O-A-CAP,

4  Youth Outreach Adolescent Community Awareness Program.

5    So, here is an individual who is making

6  efforts, is trying to find employment, had found

7  part-time employment in a (inaudible) Colony, is doing

8  volunteer work.

9    He has provided that information to Mr.

10  Bergmann.  He indicated to Mr. Bergmann on the day that

11  he asked about it, that the BMW was a car that he wa

12  using.  I don't want to denigrate the nature of the

13  violations, they are serious violations, and certainly

14  they could call for incarceration.

15    I am requesting that three months, four

16  months shy of him of walking off his entire supervised

17  release, that Your Honor not incarcerate him, that you

18  give him an opportunity to continue to comply with all

19  of the rules and regulations, rules and regulations

20  that from my understanding he had been in compliance

21  with for four years up until the moment that he has his

22  confrontation with Mr. Bergmann.

23    Now, I am not faulting Mr. Bergmann,

24  obviously he is doing his job.  He has violated him

25  based on real violations and we have admitted those

61

violations.

The question is what do we do now with Mr. Williams at his age at this point in time when, in fact, it looks like there is some communication or personality conflict between the two of them.

THE COURT: Well, I don't know about that. But, there was evidence, a complaint was filed. If every time a person on supervised release filed a complaint to take the probation officer off, that would be taken as evidence that there was a problem, we would be out of business.

That is the nature of the beast. As far as I know, there was no disciplinary action taken, and the complaint went away. So, I am not putting too much weight on that.

MR. HETZNECKER: Fine. All I am saying is there is obviously a conflict between the two of them.

THE COURT: Well, there is no conflict, I don't understand what you mean by conflict. A minute ago, you hadn't yet handed over that information. I tell you that there is a problem, and the problem is is Mr. Williams' attitude. He doesn't want to, he doesn't want to really live up on the supervised release, and as a result of that, friction comes into the system.

62

1          Until, Mr. Williams, you get on with the
2   program, you are going to run into problems.
3          MR. HETZNECKER:  Your Honor, I agree with
4   you.  What I would request is that Your Honor not
5   incarcerate him and give him a second chance.
6          THE COURT:  Okay.  Fine.  Let me hear from
7   Mr. Williams.
8          MR. HETZNECKER:  Thank you, Your Honor.
9          THE COURT:  Let's swear him in.  If you want
10  to say something, you don't have to say anything, but
11  if you do now is the time to do it.
12         THE DEFENDANT:  I would like to.
13         MR. HETZNECKER:  Your Honor, may I have one
14  moment?
15         THE COURT:  Why don't you talk to him first
16  and see if he wants to speaks to the Court.
17         MR. HETZNECKER:  Yes.
18         (Pause in proceedings.)
19         DERRICK WILLIAMS, Defendant, Sworn.
20         COURTROOM DEPUTY:  Please state your name for
21  the record.
22         THE DEFENDANT:  Derrick Roger Williams.
23         THE COURT:  Mr. Williams, tell me anything
24  that you would like me to consider.  I was not your
25  sentencing judge.  We have not had any dealings with

63

1   each other, so I want to give you, you know, every

2   opportunity to, you know, be able to successfully

3   complete your supervised release.

4           THE DEFENDANT:  Yes, I appreciate that, Your

5   Honor.  First and foremost, I'd like to apologize

6   to you for wasting your time with Mr. Bergmann

7   inferences against me.

8           First of all, I'd like to say that I had --

9   I'd like to say just that I had James Wolf, then I had

10  Mr. Gordon Thomas, and I had Tracy Harris, then I had

11  Gordon Thomas and then I got Mr. Bergmann.

12          Throughout all of these conversations, Your

13  Honor, Your Honor, I had told Mr. Wolf that I talked to

14  Aaron,  I talked to people in prison.  Then I had

15  Gordon Thomas, told him the same thing, told Tracy

16  Harris, told him the same thing.

17          Got Mr. Gordon Thomas back because he was out

18  on accident, something to do with his shoulder or

19  something, then I get Mr. Bergmann.  I talked to Mr.

20  Bergmann.  Every time I talked to him, he told me

21  something about talking to the inmates in prison.  I

22  put that on my monthly statements every time when I

23  talked to him.

24          He would ask me we're not (indiscernible), do

25  I know convicted felons.  He would ask do I know

64

1  somebody, where he live at.  He would tell me I have to

2  meet him on the street corner.  So, as a result of all

3  this, Your Honor, it was a type of friction.

4          I understand what you're saying as far as the

5  burden is on me, but I never disobeyed anything Mr.

6  Bergmann told me.  Now, he says to you today that I

7  never disclosed my finances.

8          I said Mr. Bergmann, the paper's here that I

9  have in front of me.  I told Mr. Bergmann about the

10  thirty thousand dollars, legal daily number, I paid

11  taxes on it.

12          I got a piece of property that my father left

13  me when he passed away, I got twenty-two thousand.  I

14  had an accident case, I got eighteen thousand.  Mr.

15  Bergmann has all of that, all of that, sir, so I'm

16  really confused how Mr. Bergmann comes to Court today

17  and he tells you --

18          THE COURT:  How often do you provide

19  financial information to the probation office?  Is

20  there a monthly reporting of some sort?

21          THE DEFENDANT:  Well, what happened was, sir,

22  that Mr. Bergmann told me to fill out these financial

23  reports and I filled out the report and I mailed it to

24  him and he told me he received it.  But, now he tells

25  you today that he doesn't have his file.  So, I'm

really lost.

I mean, I been seeing Mr. Bergmann for nine months.  I've never had a conversation about my finances because (indiscernible) with the finances, and I paid taxes on the finances.  I gave my tax reports.

But, he comes here today and to me, and you can correct me if I'm wrong, but he's trying to infer something about me doing something wrong, when I provided him finances that I obtained through my father's insurance money, and from me hitting the number, through selling a piece of property, and I had an accident case where I got eighteen thousand dollars. So, I'm really lost, honestly.  So, he's saying that I missed, I haven't.

I was doing community service without even owing the Court community service.  I was doing it on my own, because I talked to Mark Grenaby (ph), his name is, and he told me if I couldn't find a job, to do community service.  So then I started doing community service.

Then I kept talking to Mr. Bergmann, he tells me well, I got to find a job.  So, I said where's the jobs at, tell me where they at.  Unemployment is ten percent the last time I seen it.  So, add that in, Your Honor, with being a convicted felon, so that's about

1    thirty percent.  So, I don't know what Mr. Bergmann

2    wants from me.

3              THE COURT:  Where are you looking for work?

4              THE DEFENDANT:  Well, I filled out an

5    application for the City for sanitation, for asphalt

6    worker.  I filled out an application out for AMTRAK, I

7    filled out an application for CHOP, Children Hospital.

8              Like, for example, they said I'm associating

9    with convicted felons.  I have never been seen with

10   them for four and a half years.  Now, for example, I

11   had this job, the job that I have now, a convicted

12   felon told me about it.

13             The person with this job here with Asterware

14   (ph), a convicted felon told me they was taking the

15   test, and I was able to take it.  So, I don't really

16   understand this convicted felon thing.

17             THE COURT:  Okay.  Well, how about your

18   co-defendants in the case.  Do you have any calls, do

19   you see them on the street?

20             THE DEFENDANT:  I'd like to address that.

21             THE COURT:  Yes.

22             THE DEFENDANT:  Like, for example, again, I

23   talked to Mr. Mews, that was never really an issue, him

24   telling me -- that he's telling me do or die, I can't

25   talk to Aaron Jones.  It was never a do or die

67

1    situation with Gordon Thomas.  It was never a do or die

2    situation with Tracy Adams.  It was never a do or die

3    situation with Gordon Thomas.

4         It became a do or die situation when I got

5    Mr. Bergmann, and I explained this to Mr. Mark Green.

6    I told him that he was trying to harass me, saying all

7    those things.  And, again, none of the counselors I had

8    explained this to me.

9         I been knowing Aaron for like twenty-five

10   years.  He may call me say send fifty dollars, send me

11   a mazagine with the Eagles, the draft, something like

12   that.  Tyrek on death row, he may call me, send me

13   fifty dollars for something else.  I might help him get

14   it, organize a fish fry to try to get it.

15        THE COURT:  But, you can't talk to your

16   co-defendants.  If they call, your mother is going to

17   have to say, the Court has ordered him not to talk to

18   your co-defendants.

19        Now, those may be very generous requests, but

20   you cannot do that.  You cannot talk to somebody who is

21   on death row, hey, how you doing, or what's going on,

22   even if it doesn't have anything to do with criminal

23   activity, because that is prohibited under the

24   conditions of supervised release.

25        So, I want to give you fair warning that from

68

now on, we are going to look at those very, very

carefully.  Now, if you meet somebody on the street,

you know, but if I guy is in jail, you can't have

thirty, forty, you know, conversations with somebody in

jail.

        THE DEFENDANT:  I understand what you're

saying, sir.  But, I'll explain to you that when he

told me this, and every time I had a conversation with

Mr. Bergmann, I saw where this was going.

        My mother told me this, that I was going to

be in front of a judge.  She saw it coming, too,

because I filed a complaint, and all of a sudden now he

files this about me talking to Aaron.

        When he told me that I couldn't talk to Aaron

and I sensed the situation, Aaron never called me for

like fifteen months, so I did comply with that.  But,

then he retroactively goes back now and says that he

gets all these calls.  I understand that, and I was

wrong for being in Delaware.

        But, I stopped talking to Aaron Jones.  Other

people call me, sir, so in order for them to stop

calling me, I have to tell them to stop calling me,

because they are going to keep calling on the phone.

        So, I have to push five to tell them, look,

I'm having a problem with the probation officer, I get

69

1   all the (inaudible), please don't call (inaudible),

2   this is the conversation with people who call me from

3   various states of Pennsylvania, because I was also in

4   state prison.  So, I understand that part.

5           But, he's saying today to you like I kept

6   talking to people, and kept talking to people and kept

7   talking, and if you look at the calls, the calls

8   ceased, so I was in compliance when he told me, but he

9   doesn't relate that to the Court today.

10          I haven't talked to Aaron Jones in thirteen

11  months, fourteen months, and I tell him to prove that,

12  but they won't.

13          THE COURT:  I mean, you had I think it was

14  two hundred and some months in the --

15          THE DEFENDANT:  Two hundred and twenty-three

16  months, yes.

17          THE COURT:  I mean, that is a long time.

18          THE DEFENDANT:  Yes, sir.

19          THE COURT:  You don't want to go back.

20          THE DEFENDANT:  Sir, I've been complying.

21          THE COURT:  You have done well.

22          THE DEFENDANT:  Yes.

23          THE COURT:  I mean for four years, you've

24  done well.  So, but you've got to change the attitude a

25  little bit, and don't get in trouble over these kinds

70

1   of things.

2          So, if you change your attitude, I think

3   there is, you know, I think there is no reason why you

4   can't get a job and, you know, get reactivated, but you

5   are not a free agent.

6          You are going to be watched because of what

7   you did.  As a result of that, society wants to keep an

8   eye on you for some period of time to be sure that you

9   are going in the straight.

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  Okay.  Thank you.  Mr. Fisk, the

12   final word here.

13          MS. FISK:  Thank you, Your Honor.  With

14   regard to the defendant's explanation that he had to

15   tell people he could no longer continue speaking to

16   them, I would note that with regard to many of the

17   other inmates, there were multiple calls with them from

18   the time that he was told to stop speaking to them

19   through January of this year when the last recorded

20   phone call takes place.

21          THE COURT:  How many of those folks from that

22   case are still in jail, how many are out?

23          MR. BERGMANN:  Your Honor, two of the

24   individuals who are on the phone list are from his

25   instance offense in addition to Aaron Jones, so three

1  total.  There are several inmates that had been

2  released and are already in the community.  I don't

3  know the exact numbers, Your Honor.

4          THE COURT:  Okay.

5          MS. FISK:  There are other state inmates, as

6  well as former co-defendants, but multiple calls and

7  contacts with them from the time he was even told again

8  not to have contact.

9          Mr. Hetznecker told the Court how well the

10  defendant was doing for four years.  In fact, he

11  started violating the conditions of supervised release

12  in December of 2007 when the contacts with Aaron Jones

13  are reflected.

14          THE COURT:  These was C violations, we've had

15  a whole series of them, yes.

16          MS. FISK:  That's correct.

17          THE COURT:  Any evidence of criminal

18  activity?

19          MS. FISK:  No, Your Honor.

20          THE COURT:  Okay.

21          MS. FISK:  I would note that Mr. Bergmann has

22  shown me a note from July of 2009 when Mr. Bergmann

23  sent the defendant to the part of probation that deals

24  with helping probationers get jobs.

25          Though the defendant stands before you today

72

1    and tells you today that he has been trying to get a

2    job, on July 1st, 2009, the defendant is quoted as

3    telling not Mr. Bergmann, but the individual in the

4    employment assistance interview office, "I don't have

5    to work as long as I have enough money coming in from

6    this leasing," referring to the dump trunk.

7            So, the versions that are coming are whatever

8    is convenient, I would submit to the Court and not

9    entirely credible, particularly given the fact that the

10   defendant has lied directly to Mr. Bergmann about other

11   questions asked in the course of --

12           THE COURT:  Let me ask you this.  Let's

13   assume that you ran a business of some sort, for

14   example, a truck.  Let's take a specific example.  You

15   have a truck and you lease out the truck, you know, a

16   completely legal proposition and you get income from

17   that truck --

18           MS. FISK:  Yes.

19           THE COURT:  -- and you don't want to work, is

20   that a violation of supervised release?

21           MS. FISK:  Well, I think one of the purposes

22   of supervised release and the requirement that you

23   work, is to prevent you from having time to do things

24   that are inappropriate.

25           THE COURT:  So, it's not necessarily to

73

1  support yourself?  In other words, you know, a wealthy

2  person --

3          MS. FISK:  There are two purposes, certainly.

4          THE COURT:  -- you would require him to work

5  not to support himself or herself, but just simply to

6  kind of like keep him busy?

7          MS. FISK:  Well, to prevent you from having

8  too much time to hang out.  He used to be hanging out

9  on the street corner.

10         THE COURT:  Well, then the idea is that in

11 lieu of work, if work is not available, then he should

12 be required to perform community service?

13         MS. FISK:  That's correct.  And the

14 government would ask that any condition of supervised

15 release include that he maintain full time employment

16 or perform community service when not working full

17 time.  I would note that the government --

18         THE COURT:  If he does not have that.  That

19 makes sense.

20         MS. FISK:  The government has not sought a

21 violation on the defendant's work because despite his

22 only having twelve hours a week of paid employment, he

23 has --

24         THE COURT:  Okay.

25         MS. FISK:  -- been providing service.

74

1          THE COURT:  Okay.  My proposed sentence would

2    be this.  The purpose of supervised release -- and

3    there comes a time where there are defendants that just

4    cannot stay in supervised release, and there comes a

5    time where the cost of supervision exceeds any progress

6    that can be made as a result of that.

7          However, we have to keep in mind the nature

8    of the offense that underlies your conviction, which is

9    an extremely serious offense.  Although under different

10   circumstances we would say hey, look, enough is enough,

11   particularly when you are close to your five years.  I

12   don't think we are there yet, because I don't think,

13   Mr. Williams, you have yet come to the realization that

14   you've got to obey these restrictions and these

15   regulations.

16         On the other hand, I don't think we would

17   achieve much by putting you in jail for, you know, a

18   few weeks or a few months, that is not going to do

19   anything.

20         What we're going to do is to set up a program

21   and you are going to be on notice of what the rules and

22   regulations are, and the keys to the jail are going to

23   be, you know, in your pocket.

24         So, I will revoke supervised release.  I will

25   order you to serve one day in custody, and you will

75

1  report to the marshal's office here in this building

2  and will stay for a period of not less than twenty-four

3  hours.

4          I will extend supervised release by three

5  years.  During the time of supervised release, you will

6  comply with all of the standard conditions that have

7  been set up by this Court, but you will also comply

8  with the following special conditions.

9          You will maintain residence at your mother's

10 house unless a change of residence if approved by the

11 probation office.  You will provide monthly statements

12 of your financial status, and if you have not provided

13 income tax returns, you will make copies available.  I

14 understand you may have already provided that.  But, I

15 want monthly financial reports from you.

16         You will maintain regular employment.  By

17 that I mean either twenty hours of work, or an

18 equivalent number of hours of community service.  You

19 wil not speak to any of the defendants in the

20 underlying case, whether they are in jail or not in

21 jail.

22         That is a specific special condition, because

23 as a general condition that you don't associate with

24 convicted felons, but here because you may know these

25 folks from before, and regardless of whether or not

1  criminal activity is afoot, it's just a general

2  prohibition that you have to abide by in this case.

3      So, I think that this is a fair way of saying

4  these are the rules, they have to be abided by.  Mr.

5  Bergmann is trying to do his job.  He is not a perfect

6  human being, but he is trying to do his job as far as I

7  can tell as best as he can.

8      You are on supervised release.  It is not a

9  pleasant thing to do, but you have got to get on with

10  the program.  So, I think that when we get as in this

11  case a bunch of C violations, it means friction more

12  than anything else, but it gives you almost a warning

13  sign that things are not working out well.

14      I think you are getting a warning sign here

15  today.  The one day should be served as soon as it can

16  be worked out at the direction of the probation office,

17  and it is so ordered.

18      Mr. Williams, you have a right to appeal my

19  sentence today.  If you wish to appeal the sentence,

20  you have to file a notice of appeal within ten days

21  from the date that I enter the order revoking your

22  supervised release.

23      You have a right to be represented by a

24  lawyer on the appeal.  If you cannot afford the

25  services of a lawyer on the appeal, one will be

77

1    appointed to represent you.  Anything further today?

2            MR. HETZNECKER:  No, Your Honor.

3            MS. FISK:  No, Your Honor.

4            THE COURT:  Very well.

5            ALL:  Thank you, Your Honor.

6            (Proceedings adjourned, 11:47 p.m.)

7                        *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION

I, Jeff Nathanson, do hereby certify that the foregoing is a true and correct transcript from the electronic sound recordings of the proceedings in the above-captioned matter.

6-15-10
Date

Jeff Nathanson